UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SCOTTIE DALE PENNINGTON, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. 2:13-cv-00017 |
| v. ) | Judge Sharp |
| ) | |
| BOB TERRY; DAVID DUKES; ) | |
| KEN SIRCY; BRIAN LONG; ) | |
| JAMES HARRIS; AND CHRIS LYNN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Before the Court is Defendants' Motion for Summary Judgment (Docket No. 20) on Plaintiff Scottie Dale Pennington's Complaint, which alleges that officers of the Cookeville Police Department used excessive force in effecting his arrest on March 2, 2012 (Docket No. 1 at 3). Defendants are Bob Terry, Police Chief at the time of Plaintiff's arrest, Major David Dukes and Lieutenant Ken Sircy, who conducted an investigation of Plaintiff's initial complaint to the Department, and the three officers at the scene of the arrest, Major James Harris and Officers Brian Long and Chris Lynn. For the following reasons, Defendants' Motion will be granted.

### I. SUMMARY OF THE FACTS

On the evening of March 2, 2012, Sergeant Harris pulled over Robert Caudill in a routine traffic stop for driving with a revoked license. Plaintiff was a passenger in Mr. Caudill's pickup truck. Officers Lynn and Long arrived as backup soon after. The subsequent events were recorded on the dashboard cameras mounted on each officer's vehicle.

1

Initially, Officer Long stood at the passenger's side window while Officer Lynn stood at the driver's side. Sergeant Harris was out of the range of the dashboard cameras, presumably next to his vehicle. The officers were willing to release Mr. Caudill and Plaintiff on the condition that someone with a valid driver's license retrieve the car. Mr. Caudill agreed to call his brother for this purpose. Over the course of the conversation, however, Plaintiff's demeanor raised suspicion and Officer Long asked him to exit the vehicle. Officer Lynn remained with Mr. Caudill.

The following incident was captured primarily by the dashboard camera mounted on Officer Long's vehicle, which was parked to the rear right of the truck. The view from Sergeant Harris' vehicle, parked almost directly behind Mr. Caudill, was largely obscured by the truck. Officer Lynn parked to the rear left of the truck. The video footage from his dashboard camera shows that he remained with Mr. Caudill during the majority of the stop.

As Plaintiff exited the truck, he coughed and appeared to transfer something from his hand to his mouth in an attempt to ingest it. Sergeant Harris rushed to Plaintiff, seizing his arm and neck to prevent him from swallowing what the officer believed to be pills. Officer Long and Sergeant Harris pushed Plaintiff to bend at the waist and tried to retrieve the objects from his mouth. As Plaintiff struggled, the officers pushed him to the ground and held him on his stomach while ordering him to spit the pills out. Officer Long handcuffed him while Sergeant Harris held his neck to secure him on the ground. Plaintiff exclaimed that he did not have anything in his mouth.

Sergeant Harris rolled Plaintiff onto his back and asked if he had already swallowed the pills. Officer Long passed Sergeant Harris a flashlight to examine Plaintiff's mouth. The

officers remarked that they could see orange residue on Plaintiff's tongue and teeth, indicating that Plaintiff had ingested the pills.

Sergeant Harris returned Officer Long's flashlight. The dashboard camera recorded Sergeant Harris then drawing a tool from a holster at his waist, which he dismantled into two pieces – one, a flashlight held in his left hand, and the other, what appeared to be a taser or stun gun, in his right (Def. Exh. 7 at 4:11). Sergeant Harris appeared to touch the taser to Plaintiff's torso briefly (id. at 4:15). Plaintiff gave two short yells and then continued to protest that he did not have anything on him. The video indicates Plaintiff did not convulse and remained lucid throughout the struggle. Subsequently, Sergeant Harris appeared to reconnect the flashlight to the taser and returned it to his holster (id. at 4:18). Sergeant Harris then instructed Plaintiff to roll onto his stomach and appeared to unpluck two objects, perhaps taser prongs, from Plaintiff's body (id. at 4:45).

Using his flashlight, Officer Long searched the ground around the truck's passenger-side door and then searched the cab. He called out that he had found two syringes on the seat (id. at 5:28). Sergeant Harris continued to search the ground around Plaintiff with his flashlight, then rolled Plaintiff onto his sides to search his pockets (id. at 6:29). It is unclear from the video footage, but the officers' comments indicate they discovered one pill in Plaintiff's pocket and that he spit another pill onto the ground.

The officers repeatedly asked Plaintiff if he required medical attention. Sergeant Harris asked, "Do we need to call an ambulance? Are you going to pass out out here?" (Id. at 6:45). Plaintiff responded, "No, I'm fine." (Id. at 6:49). Sergeant Harris continued "After your little orange pill kicks in, are you going to be alright?" (Id. at 6:57). Plaintiff insisted he did not have any pills. Sergeant Harris shone a flashlight in his mouth again and noted his tongue was orange.

Sergeant Harris commented, "This is for your health. Now, I don't care because you're going to jail." (Def. Exh. 7 at 7:52). Officer Long added, "It ain't worth dying over." (Id. at 8:06). Plaintiff continued to refuse medical attention.

The officers drew Plaintiff to his feet. Officer Long guided him farther from the truck, and out of the view of the dashboard camera. He asked once again, "Do you need an ambulance to check you out?" to which Plaintiff replied, "No, I'm fine." (Id. at 8:45). The two officers continued to question Plaintiff out of view of the camera. Sergeant Harris returned to search the ground around the truck and the interior of the cab once more.

Ten minutes later, Plaintiff was placed in Officer Long's vehicle and taken to Putnam County Jail. There, he responded "No" to all inquiries on the inmate medical form, including "do you have any injuries that need treatment at this time," "is inmate alert, oriented to time, place, person," and "is inmate free of injuries, jaundice, rashes, or lice?" (Docket No. 20-11). Plaintiff pled guilty to unlawful possession of a Schedule III narcotic. He was fined $750.00 and placed on probation for 11 months and 29 days (Docket 20-9).

Despite his statements to the contrary at the time of his arrest, Plaintiff's Complaint asserts he did require medical attention for injuries sustained to his face, neck, and spine sustained during his arrest. He claims the episode left him with severe and permanent emotional and psychological injuries, requiring continuous care since the incident, as set forth below. The following assertions come solely from Plaintiff's Complaint. He has provided no medical records, affidavits from care providers, or other evidence to this effect.[1]

---

[1] Plaintiff's exhibit list includes "ER Records" and "Photo taken shortly after the incident," (Docket No. 62), but these materials were not incorporated in prior submissions. The Court notes that the extent of Plaintiff's injuries is not determinative to the issue at hand. See Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012) ("In determining whether there has been a violation of the Fourth Amendment, [the court must] consider not

4

Plaintiff visited the Emergency Room at Riverview Regional Medical Center on March 3, 2012, "for acute pain associated with trauma" and "was advised to follow up" with his primary care physician, which he did a few days later (Docket No. 1 at 3). Plaintiff was referred to Livingston Regional Hospital for an x-ray and diagnosed with a "Right, Knee Contusion" and "Acute Myofasical Strain (Neck)." (Id. at 4). His discharge report also noted an "Old Nasal Bone Fracture." (Id.).

On June 6, 2012, Plaintiff visited the Cookeville Regional Medical Center for additional x-rays, which revealed injury to his neck and possible spondylosis (degenerative arthritis in the spine). He was prescribed medication and a cervical collar. He later received MRI and CT scans and "was advised the need [*sic*] for surgery as a result of the injuries" to his neck (id. at 6).

Plaintiff lodged a complaint with the Cookeville Police Department on December 18, 2012. Major Dukes, with the assistance of Lieutenant Sircy, conducted an investigation and concluded that the officers who had arrested Plaintiff had not used excessive force.

Plaintiff then filed a pro se Complaint before this Court on March 1, 2013 (Docket No. 1). He seeks "a declaration that the acts and omissions described … violated plaintiff's rights under the Constitution and Law of the United States" as well as compensatory and punitive damages (Docket No. 1 at 6).

On December 16, 2013, Plaintiff filed a subsequent submission in which he alleged that Sergeant Harris shot him with a taser during the arrest to make him spit out the pill (Docket No. 45 at 2). Plaintiff explained he was unconscious at the time and did not remember being tased, but a friend who had worked as a corrections officer saw burns on his skin the morning after the

---

the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence.") (internal citations omitted).

arrest and identified them as marks from taser prongs. Plaintiff offered stills from the dashboard camera footage to identify where, he claimed, Sergeant Harris shot the taser at him from a distance of five feet as he lay handcuffed on the ground.

Upon careful inspection of the footage, the Court does not believe the video recording supports this claim. However, Plaintiff's identification of Sergeant Harris holstering the taser and removing the taser the prongs is consistent with the Court's review.

Defendants responded that "[n]o Cookeville Police Officer used a taser on Scottie Pennington." (Docket No. 57 at 2) and quote Plaintiff's deposition:

> A: You'ns are gung-ho. This place is going to end up – too gung-ho, end up killing …
> Q: Well, nobody pulled a gun on you. They didn't even pull a taser on you, did they?
> A: No. Because I wasn't resisting. I give them no reason.

(Docket No. 57-1 at 2).

Plaintiff's December 16, 2013, filing set forth further misconduct allegedly perpetrated by Defendants, including tampering with the dashboard camera footage, retaining a fourth, heretofore unseen video in which Plaintiff agrees to go to the hospital and submit to a drug test, and Officer Lynn's personal vendetta against Plaintiff for dating his ex-girlfriend. To illustrate this alleged foul play, Plaintiff offered a still image of rain on a windshield from one of the dashboard cameras with the notation "[i]t was not raining that day." (Docket No. 45 at 16). However, the Court's review of the footage from all three cameras indicates that it did start to rain after Plaintiff had departed the scene with Officer Long. The Court's examination of the record in its entirety indicates Plaintiff's allegations of additional misconduct are unfounded.

## II. LEGAL ANALYSIS

Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As explained by the Supreme Court, "the plain language of Rule 56[ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering a motion for summary judgment, the Court views the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." Smith Wholesale Co. v. R.J. Reynolds Tobacco Co., 477 F.3d 854, 861 (6th Cir. 2007). However, "[t]he mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Defendants' Motion for Summary Judgment asserts that Sergeant Harris and Officer Long used a level of force that was "objectively reasonable under the circumstances" to seize and arrest Plaintiff (Docket No. 27 at 24). In the alternative, Defendants argue the officers are subject to qualified immunity, which "protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." Austin v. Redford Tp. Police Dept., 690 F.3d 490, 496 (6th Cir. 2012) (internal citations omitted). As for the remaining Defendants, the Motion argues, none were at the scene of the arrest or had any involvement in it.

7

"The Supreme Court instructs lower courts to perform a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity." Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). "Courts should determine whether 'the facts alleged show the officer's conduct violated a constitutional right'" and, if so, "whether the right was clearly established." Id. When a defendant invokes this defense, it is the plaintiff's burden to show it does not apply. Id. (citing Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)). To do so, a plaintiff must satisfy both elements of the inquiry or qualified immunity insulates the defendant from civil damages. Martin v. City of Broadview Heights, 712 F.3d 951, 957 (6th Cir. 2013). The Sixth Circuit has recognized that "close calls" merit the protection of qualified immunity. See Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012) ("The essence of qualified immunity … is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways.").

Thus, the Court first looks to whether Defendants violated Plaintiff's constitutional right to be free of excessive force.[2] "Where … the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their person … against unreasonable … seizures' of the person." Graham v. Connor, 490 U.S. 386, 395 (1989); see also Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900 (6th Cir. 2004) ("[T]he right to be free from excessive force is a clearly established Fourth Amendment right.").

---

[2] Plaintiff's Complaint incorrectly invoked Eighth Amendment protections, which are "designed to protect those convicted of crimes," and applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Ingraham v. Wright, 430 U.S. 651, 664 & 671 n.40 (1977). The Court is mindful that Plaintiff's Complaint was filed a year before he engaged counsel in March 2014 (Docket No. 47). Allegations contained within a pro se complaint are held "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Therefore, the Court will relocate Plaintiff's claim to the correct Amendment for the purpose of its analysis.

Determining what force is "reasonable" in this context "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal citations omitted). This objective inquiry, viewed from the perspective of a "reasonable officer at the scene" requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

The Sixth Circuit has found the use of tasers on compliant suspects violates the Fourth Amendment. See e.g., Kijowski v. City of Niles, 372 F. App'x 595, 599-600 (6th Cir. 2010) (finding officer's use of a taser to subdue a suspect was not objectively reasonable when suspect did not resist arrest). Even in the face of "some level of passive resistance," it may be unreasonable to use "significant force on a restrained subject." Meirthew v. Amore, 417 Fed. Appx. 494, 499 (6th Cir. 2011) (collecting cases). However, "the line between resistance and non-resistance is not easily defined and sometimes deploying a taser is the least forceful means available to an officer to obtain the compliance of an uncooperative suspect." Jones v. City of Warren, 2014 WL 1464458, at *7 (E.D. Mich. April 15, 2014) (citing Hagans, 695 F.3d 505 (6th Cir. 2012)).

The use of significant force on a restrained suspect is not per se unreasonable. When an arrestee is handcuffed, "courts have generally found the use of a [t]aser … reasonable where the facts show that the suspect posed an immediate threat to a valid law enforcement aim – for example, the suspect's conduct threatened his own safety … or the suspect attempted to destroy evidence." Boyden v. Township of Upper Darby, 5 F. Supp. 731, 738 (E.D. Penn. 2014). In

9

Love v. Rockford Ill. Mun. Police Dep., the court found the use of a taser on a suspect attempting to swallow a controlled substance "was reasonable in light of plaintiff's apparent effort to destroy evidence as well as endanger himself from ingesting the drugs." 2013 WL 159246, at *2 (N.D. Ill. Jan. 15, 2013). See also Monday v. Oullette, 118 F.3d 1099, 1104-05 (6th Cir. 1997) (finding an officer's single shot of pepper spray directed at the face of an unarmed individual who the officer reasonably believed at risk of overdosing was reasonable); Singleton v. City of Newburgh, 1 F.Supp.2d 306, 315 (S.D.N.Y. 1988) (granting a motion for summary judgment where the officer pepper sprayed a suspect he reasonably believed was about to swallow contraband).

Where the use of a taser runs afoul of the Fourth Amendment, officers often deployed them an "excessive" number of times or failed to give suspects the opportunity to follow verbal commands. See e.g., Landis v. Baker, 297 Fed. Appx. 453, 463 (6th Cir. 2008) (affirming the district court's conclusion that the defendant officers "should have known the gratuitous or excessive use of a taser would violate a clearly established constitutional right"); Bibbs v. Allen, 2014 WL 3956127, at *6 (E.D. Mich. Aug. 13, 2014) ("Where … an officer seeks to justify his use of force as necessary to secure compliance with a command, the officer must show that before he employed the force, he afforded the suspect a reasonable opportunity to comply with the command."). Cf. Devoe v. Rebant, 2006 WL 334297, at *6 (E.D. Mich. Feb. 13, 2006) (granting motion for summary judgment as officer's "single use of the taser gun causing a one-time shocking which did not inflict any serious injury" was reasonable under the circumstances when a handcuffed suspect refused to enter a patrol car).

In considering the current Motion for Summary Judgment, the Court "view[s] the facts in the light depicted by the videotape." Scott v. Harris, 550 U.S. 372, 381 (2007) (granting a

defendant police officer's motion for summary judgment on an unreasonable seizure claim). The footage on Officer Long's dashboard camera recorded the officers repeatedly instructing Plaintiff to spit the pills out of his mouth. Plaintiff did not comply. At best, a jury could conclude from the video footage that Sergeant Harris then touched a taser or stun gun to Plaintiff's torso one time for a period less than five seconds. The footage also indicates the officers reasonably believed Plaintiff was attempting to destroy evidence, as he later admitted (Docket No. 55 at 1), and posed a risk of danger to himself.

### III. CONCLUSION

On balance, the Court concludes that the officer's treatment of Plaintiff during the arrest was reasonable in light of the governmental interests in preservation of evidence and prevention of a potential drug overdose. Because the conduct of the officers at the scene did not violate Plaintiff's rights under the Fourth Amendment, Plaintiff cannot meet his burden under the first portion of the qualified immunity inquiry and the Court's examination need not extend further.

Those officers not at the scene are entitled to summary judgment because 42 U.S.C. § 1983 requires personal responsibility and does not allow for respondeat superior liability in the absence of custom, policy, or practice, for which there is no evidence here.

Defendants are entitled to qualified immunity and their Motion for Summary Judgment (Docket No. 20) will be granted. An appropriate Order will enter.

*Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE